Environmental Coalition v. Scott Pruitt. Mr. Masonette, whenever you get ready, we'll hear from you. Good morning, your honors. My name is James Masonette. I'll be arguing today on behalf of the United States Environmental Protection Agency. Also with me at council table is Mr. James Curtin from the U.S. EPA. So, this is a case about TMDLs. When a body of water is impaired by pollutants, the Clean Water Act directs the state to submit a total maximum daily load, or TMDL, to EPA. That TMDL has to identify the volume of pollutants the body of water can receive and still meet its water quality standards. Those TMDLs are then used as planning tools. Now, the state of West Virginia has submitted thousands of TMDLs to EPA over the last decade, but it hasn't submitted any TMDLs for streams that are being biologically impaired by a condition known as ionic toxicity. The Clean Water Act doesn't set any deadlines for these TMDLs, but the district court here decided that West Virginia was shirking its duties, so it used this doctrine of constructive submission to direct EPA to step in and take action. The district court's decision should be reversed for two reasons. First, because it got standing wrong. It allowed the plaintiff, Ohio Valley Environmental Coalition, or OVEC, to sue over 573 streams located throughout West Virginia, when OVEC's members have only claimed an interest in a small number of the streams. Do they have standing for those small number of streams? We never disputed that they did, Your Honor, so we agree that the case should have gone forward but been limited to those 41 streams. Yes, so really what difference does it make? It makes a difference to the scope of relief, Your Honor, and the level of disruption to the state of West Virginia's TMDL program. Only if you lose. Only if we lose, that's true. Second, Your Honor, and maybe more importantly, the district court should be reversed because it got constructive submission wrong. Constructive submission is a judge-made doctrine. It's not found in the Clean Water Act. Other courts have been very cautious about it. They've taken great care to keep that doctrine narrow, but the district court here wasn't cautious. It took constructive submission farther than any other court has taken it. It significantly expanded the doctrine, and it put itself in direct conflict with the priorities the state of West Virginia's legislature has set for its water program. So I think I'll start with constructive submission. I want to talk a little bit first about the standard for constructive submission, and then I want to turn to the court's application of the standard to these facts because I think the district court made important errors in both aspects. So constructive submission, as I said, is a doctrine that every other court that has applied it has kept very narrow. They've held that it can only apply in the most extreme cases, cases where a state has done no TMDLs for 10 or 20 years, where the state has engaged in a clear and unambiguous refusal to set any TMDLs. It's a bright-line test, Your Honor. That's what I'm telling you today. A court should only make a finding of constructive submission that passes that bright-line test. In that regard, do you know what the status of SB 562 is? The status of it? So it's still state law. So SB 562, Your Honor, of course, is the bill that the West Virginia State Legislature passed that told the West Virginia Department of Environmental Protection to take a step back from these TMDLs and to develop a new assessment tool that takes a broader look at the biological health of West Virginia's streams. Does that in any way affect your argument, what they told? Yeah, these are the state's priorities for its Clean Water Act Pollution Control Program. The state legislature has told us that it has told the West Virginia Department of Environmental Protection that it should take the time to develop a new tool that uses a broader measure of the health of these streams. The current tool relies just on macroinvertebrates to judge the health of the streams. The West Virginia State Legislature said, no, no, take a step back, develop a new tool that looks at both macroinvertebrates and fish, and then set these TMDLs. Well, I think that the gist of Judge Floyd's question, though, is, or underlying it is, that the West Virginia Legislature has been at this a long time, right? Well. Or assertedly been at it a long time. I mean, it depends what you mean by a long time, not in the terms of the doctrine of constructive submission. We're talking about 10 or 20 years. No, no. In being told, they enacted this law, and then they said local state environmental protection agency, I've forgotten what it's called, develop these standards. And how long ago did they enact the law? So the law was enacted in 2012. 2012, right. These are tough scientific issues, Your Honor. I mean, first of all, the first scientific, published, peer-reviewed scientific studies that connected ionic toxicity to biological impairment only appeared in 2008. Okay, so let me ask you this. Given the language in the Clean Water Act, and with respect to TMDLs, do you call them anything else? Or do you call them TMDLs? No, that's only the acronym. That EPAs from time to time is going, the state is to submit these. Does the EPA have a position that West Virginia does have a duty to submit TMDLs at some point? Yes. EPA's position is that West Virginia has to submit these TMDLs, and West Virginia itself has acknowledged that they have to do that at some point. And they can't delay it indefinitely. That's correct. And we have a schedule now, of course. I understand that, but the schedule is generous. Well, again, Your Honor, these are tough scientific issues. I think you may be underestimating how hard it is to set these TMDLs. Are there other states that have to deal with TMDLs? It looked like from these other opinions that have come out that there are. Yes, you can see that many states have grappled with the difficulty of setting these TMDLs. That's why we have this body-long construction. So don't the states borrow language and science from each other? You know, the Supreme Court is always talking about things percolating, which seems a particularly appropriate analogy here. As part of the state-federal partnership here, EPA's role, part of its role under the Clean Water Act, is to coordinate those kinds of efforts and provide. Yes, and I'm not really critiquing EPA. I'm more interested in the state here and whether it is acting at all. So, I mean, again, this is a hard issue. This is a new issue. But some states have dealt with it, right? I'm not aware. Nobody has gotten any TMDL standards up? Oh, no, no. First of all, Your Honor, let me just explain to you. I mean, West Virginia has thousands upon thousands of TMDLs. They've set them for all kinds of other factors, just not for ionic toxicity. I'm not aware that any other state has yet set TMDLs for biological impairments caused by ionic toxicity. It's a relatively new issue. It's a complex issue because these chemicals are affected as they move through the environment. Do they appear in every state? I know that this is a West Virginia problem. Well, you know, I can't speak to that comprehensively. Some states, I understand, they have rules that relate to this one. It has to do with salt for snow removal, which also affects salinity and conductivity. But, you know, for example, the new assessment tool that West Virginia is developing here, they want to incorporate fish into the tool, into this measure of biological health. Well, to do that, you go out and you count the fish in a stream, right? But that doesn't tell you anything because you need to know how many fish should there have been, right? So you've got to build a statewide index of biotic integrity for fish that sort of gives you a sense of these kinds of streams, how many fish they have. Then you can go out and look at the stream. That all takes work. It takes time. EPA has been funding those efforts. And West Virginia has hired scientists at West Virginia University to work on those issues. Did EPA negotiate these times line that the state came up with? So the schedule is memorialized in a memorandum of agreement between EPA and West Virginia. That's not exactly what I asked, though. Was it negotiated or did the state just say this is it, this is all we can do? I honestly don't know the answer to that question. I know in part what EPA is also trying to allow West Virginia to do here, to take the time to do, is not only develop this new assessment tool, but West Virginia's program is a watershed program. So they cycle through the watersheds. So my understanding is they're going to, once they build this tool and start developing these TMDLs, they're going to try to incorporate this process into their ongoing watershed management program. So it's going to be sort of a rolling set of deadlines and take a little longer than if they put these all at the front of the line and did them all at once. But not longer than these deadlines that are set forth right now. No, no, no. These are the deadlines that they're working towards right now. And is this contingent upon the state legislature agreeing to it? So the way Senate Bill 562 is written, as I understand it, is that once they develop the tool, they have to submit it for approval to the legislature. And then once it's approved, they'll go forward to use the tool to develop these TMDLs. And how do these deadlines figure into that? There aren't any interim deadlines inside the memorandum agreement. So they've got to get the assessment tool done first, but there's no interim deadline for that for. But the deadline is for putting them into practice. So the deadline is for submitting. Which would include the state legislature approving it. Right. Is that right? So this is all part of the current deadlines. Okay. Thank you. So turning back to the standard for constructive submission, we submit that it should be this bright line test. The only case that's made of finding constructive submission other than the district court here was this Ninth Circuit in Alaska Center, which was, again, the state of Alaska hadn't established any TMDLs over the course of a decade. TMDLs defined by federal law or state law? It's defined in the Clean Water Act, so it's under federal law. Okay. So as defined in the Clean Water Act, West Virginia has been submitting TMDLs. Yes, that's exactly right. They have made, imposed greater strictures to accommodate fish. Right. So they've established thousands of TMDLs, other conditions besides this. And they are submitting those TMDLs? Yes. It's an ongoing program. They've submitted 4,000 in the last decade, 500 since February of 2016, and I think they're on track to do another 200 or so by the end of 2019. But these aren't optional. I mean, they have to do this, right? Yeah, absolutely. It's not like they have these others and they've already done their duty, and these are just surplus TMDLs, right? No, no. Once the water is listed as impaired, they need to work to generate a TMDL. My point is basically we're talking about noncompliance with the federal law. Well. And the federal law is, of course, in a partnership, but if the TMDLs are defined by federal law and the state has to submit the TMDLs and West Virginia is doing that, it's hard to accuse it of violating the law and not making submissions when it is now, with the EPA's approval, broadening the scope of the TMDLs under state law. Right. Well, I mean, I certainly agree with you that because. Well, that's actually rhetorical. I'm not suggesting that's where I am. Okay. But is that, I wasn't sure that they were broadening. I thought that this was required under federal law that they do this ultimately. The question here is whether they have. They're not required to do it on the district court's schedule. They have to do it. Correct. But they have to do it under the EPA. Right. The way it works is they, once the water is listed as impaired, then they have to generate one of these TMDLs that says how much pollution can enter the water so that it will meet its water quality standards, and then the TMDL is used as a planning tool. Each TMDL is for each stream, and then for each impairment within the stream. So one stream might have three or four TMDLs depending on how polluted it is. You've got to bear in mind, these TMDLs are just one aspect of the Clean Water Act. This isn't the whole program, right? Oh, there's so much more. There's water quality standards. All these terms are incorporated into people's permits. So, I mean, even if OVAC can't sue to force West Virginia to do these specific TMDLs, it can still sue polluters if it can show that those polluters are discharging ionic toxicity in a way that violates their permits. And it has done. And it has done that, right, in the Fola Cole case, which this Court affirmed. So TMDLs are just planning tools. They're not enforceable in and of themselves. I'm not saying they're not important. They are required. West Virginia has a schedule to get these done. I think fundamentally what happened here is, I mean, the facts here, they never supported a finding of constructive submission. It seems that the district court really just thought that this was political interference, right, that Senate Bill 562 was just shenanigans, that West Virginia never has any intention of doing any of this. I mean, you know, there's nothing in the Clean Water Act that tells us what tool West Virginia has to use to assess biological impairment. What are the facts of record showing what they're doing? Facts of record showing what they're doing. Ah, that's a toughie, isn't it? It's a toughie because, you know, at the time, so West Virginia, I believe they explain in the facts of record that they had enlisted help from West Virginia University to help start developing this new assessment tool. I believe the record shows that. But I don't have any further update from the record. You say they are currently submitting TMDLs, but just with respect to different? There are many other water quality criteria and many other pollutants. With respect to other pollutants? Yeah, fecal coliform, iron, sedimentation. There's a long list of other criteria that waters have to meet. And they do TMDLs for all of them. They've just gotten, they've just had to take more time to do these because the West Virginia legislature sent them back to the drawing board to start on the assessment tool. Well, I mean, I think it's fair to say that underlying all this, all this ionic, the pollutant that is aimed at here that you would need a TMDL for is generated by coal companies. Isn't that generally correct? Yes, certainly coal mining is one of the sources. So this is a particularly sensitive subject with the West Virginia legislature. Right, but the, I mean, we could have no clearer expression of West Virginia's priorities for its Clean Water Act program. And the act entrusts the states with, it recognizes their right to deal with water pollution and that it's their primary responsibility. And the West Virginia legislature has told us, we think we want to take a broader look at the health of the streams before we set these TMDLs. But Judge Niemeyer just asked you an interesting question. I'm sorry, I missed it. Where is Kentucky in this? I believe that Kentucky is also working on TMDLs for, maybe not for ionic, there are other ways of attacking the same problem. They didn't have any legislative enactment. I'm sorry, I'm not aware of what the full situation in Kentucky is. But you're right, they are also dealing with this issue. Ionic toxicity, that's the pollution we're looking at, right? Right. I mean, it's any, it's the… Well, no, I'm talking, particularly in this case, that's the only one that's, they're doing it for other items, right? Well, exactly. I mean, there's a long list of other pollution. So I want to focus on ionic toxicity. Okay. Were they submitting TMDLs for ionic toxicity before the legislature passed its bill? So, two points, Your Honor. First, I'm going to make it even more complicated because it's, ionic toxicity is itself not a pollutant. It has to be biological impairment caused by ionic toxicity. So, West Virginia has not set any TMDLs for ionic toxicity yet, for biological impairment. But prior to this legislation, they had a different… Before or after, right. Like I said, the science started to emerge, you know, a little more than a decade ago. They started to work on it. They engaged in a pilot project with EPA to try to figure out how to deal with this. They had to redo their water models because, you know, this reacts with the environment as it moves through the environments. They had to change those. They did all that, and then the Senate bill came out that sent them back to the drawing board. Well, they were using a whole different way to, and the legislature didn't like it, of measuring the ionic… Well, I'm not going to comment on what the motives of the legislature may have been, but… Well, I say didn't like it because they abolished it. I mean, I'm not taking their policy there, but cause and effect. Right. I mean, there's no doubt that the West Virginia legislature said to the West Virginia Department of Environmental Protection, we want you to take a broader look at the health… We don't want you to use… …and stop focusing just on… We don't want you to use the way you're doing it. Right. That's correct, Your Honor. Well, I see I'm over my time. I mean, if the courts leave, just wrap up or… Go ahead. Take one minute. Thank you, Your Honor. So, I mean, the bottom line here for us is that we think the district court got the constructive submission doctrine wrong. It didn't apply the bright line test that other courts have applied, that the Ninth Circuit and the Tenth Circuit have both adopted. It ignored the limitations that other courts have put on that doctrine. You know, it didn't care that West Virginia has an active TMDL program that continues to establish TMDLs for other pollutants and has established thousands of TMDLs in the last decade. It refused to believe that West Virginia was really working on this new assessment tool or that it was going to follow this schedule and complete these TMDLs. Nothing like that has been the basis for finding constructive submission to any other case. There's no support in the Clean Water Act for that application of the doctrine. It stands outside the existing precedent, and it's… Do you support the doctrine as an abstract principle? We have not asked the court to reach that issue. In fact, we've asked you not to reach that issue. No, you haven't. We didn't brief it in the district courts. The district court didn't decide it. I haven't been authorized by the Solicitor General of the United States to argue whether it's a valid interpretation of the law, and I would just say we said if you feel you need to reach that issue, we asked for permission to be allowed to submit limited additional briefing because there are nuances lurking in there that I would have to get permission to explain and reconcile with the court. All right. Thank you, Your Honor. Thank you, Mr. Mason. Mr. Taney? Thank you, Your Honor. May it please the court, my name is Derek Taney, and I represent the plaintiff appellees in this matter. Respectfully, the district court did not err in concluding that on these facts, the state of West Virginia clearly and unambiguously refused to develop additional TMDLs for biologically impaired waters after 2012, the magic date, the passage of Senate Bill 562, and that that refusal constituted a constructive submission of no TMDLs for waters impaired for the biological use and therefore triggered EPA's non-discretionary duty to approve or disapprove of that submission within 30 days. This is a non-discretionary duty suit. The question is what does EPA have to do when faced by a refusal of the state of West Virginia to develop ionic toxicity TMDLs? Just to keep us all accurate and on the same text, the non-discretionary duty arises when a TMDL has been submitted and then the EPA has to react to that. That's correct. There is not the question of when a TMDL has to be submitted is not addressed. It just says from time to time. And the EPA in these circumstances has concluded, I guess in its discretion, that time to time is satisfied with the ongoing development of science and the interaction between the two agencies. But I don't think that aspect is non-discretionary. The EPA's decision of demanding TMDLs and construing what time to time means certainly doesn't fall within that non-discretionary doctrine. Respectfully, in this case, EPA has disclaimed making any discretionary call as to whether or not a constructive submission occurred. Fair enough. But I'm just saying in the statute, the only non-discretionary duty is to respond within 30 days after one is submitted. Correct. And of course, the 7th Circuit, the 9th Circuit, the 10th Circuit, with regards to water quality standards, the 11th Circuit. In fact, nearly every case that court has addressed it has determined that a state can constructively submit no TMDLs when it clearly and unambiguously expresses that it's not going to do those TMDLs. And we submit that in 2012. Not only that it's not going to do them, but hasn't done them. That's correct. It's a total blank state. It's sort of basically we're ignoring the federal law. And I submit that that's what the EPA is doing. The only state that actually had enforced that was Washington State. And they had 10, 20 years they hadn't done a thing. That is correct. But the only finding of a court of constructive submission was for the state of Alaska. It was the District Court of Washington that made that finding because of the EPA region. But nonetheless, the practical effect of the constructive submission doctrine is that there are thousands of TMDLs in this country because of the constructive submission doctrine. Are you challenging a policy or an action? The cause of action arises as a nondiscretionary duty suit under the Clean Water Act, which authorizes citizens to bring a mandamus, if you will, against the EPA to perform a nondiscretionary duty. And the way that the courts have construed it is that when the EPA is faced with a constructive submission of no TMDLs, that triggers their nondiscretionary duty to approve or disapprove. And so we are trying to compel agency action. If I might address a couple of issues that the court was discussing with Mr. Mason. I want them to approve a TMDL that has not been submitted, to approve or disapprove. In other words, they receive TMDLs from West Virginia. They just have not received, in recent times, TMDLs involving ionic toxicity involving biological life. In fact, they have never received ionic toxicity TMDLs from West Virginia. Has anybody? I can't speak for the University of States. I know that this is. Well, according to the EPA, this is new science that's being developed. And it has some required studies and requires expertise in developing a model. And those models exist. And new, I guess, is a relative term. As EPA observed, the first peer-reviewed studies linking conductivity and biological impairment were a decade ago, in 2008. So this has been going on for some time. And, in fact, when DEP took the significant action in this case that triggered, in our view, the constructive submission, it was engaged in a pilot program with EPA to develop a TMDL for a stream, Rattlesnake Hollow, that had been impaired for biological impairment since 1998. And this was in 2012. EPA and DEP were working right up to the edge. They had come up with a proposed TMDL. They were getting ready to finalize it. They hoped to have it finalized by the end of 2012. But in April 2012, in response to Senate Bill 562, DEP walked away from that process. They were on the verge of having that TMDL, but they backed away. Well, doesn't that indicate that they are actively pursuing the responsibilities under the Act? In other words, the constructive submission doctrine, as I've seen these other states have been, very narrow. It's been an attitude, a recalcitrance, basically thumbing their nose at the requirements. And here, West Virginia was working hard. You say they were on the verge of submitting TMDLs when the criteria were changed by the legislature to broaden it beyond non-vertebra to fish. And I'd like to address what the legislature did in just a moment. The question is, have they now come to a halt? Are they still doing work now to regenerate a new test? I submit on this record, things have now come to a halt. If you look at what West Virginia did, and the other thing about that moment with EPA that's important to look at, is that there's a whole decade of history prior to sitting down with EPA, where time and time again, DEP refused to develop ionic toxicity TMDLs. EPA finally said to DEP, come to Philadelphia. We need to work this out. You need to finally do one of these. We think we've got the science. We want to offer you the resources to do it. Let's get you to the goal line. And DEP withdrew from that process in response to Senate Bill 568. I'd like to clarify a little bit about Senate Bill 568. I do not think it's accurate. It sounds to me like you're speaking totally differently than the EPA is representing itself. The EPA seems to be satisfied with its relationship with West Virginia and the progress that's being made, and the two have reached some kind of a schedule to implement this mutual work, and you're saying West Virginia is just dead in the water. Your Honor, that schedule was the result of this litigation. That schedule in the memorandum of agreement that EPA was discussing was generated by EPA complying with the order that Judge Chambers issued to it to approve or disapprove of the constructive submission. That's where the schedule came from. The Senate Bill 562, coming back to that for just a moment, did not address the priorities. If you read that and it's in the joint appendix, they don't even mention the word or the acronym TMELs. The legislature did not instruct DEP to cease TMELs. What do you understand that legislation to have done? What I understand, and I think the plain reading of the legislation, was that it empowered West Virginia and directed them to promulgate for legislative approval a rule, and this has to do with the way that rules are promulgated in West Virginia. Agency rules have to be approved by the legislature. The legislature wanted DEP to set out or develop an assessment methodology to determine whether a stream was impaired. This notwithstanding the fact that DEP had two EPA-approved assessment methodologies. The legislature directed DEP to come up with this methodology. The legislature did not instruct DEP on what it was to do in the interim until it was to come up with that. Well, let me ask you. But it wasn't allowed to use those ones that it had been using. I respectfully submit that Senate Bill 562 does not prohibit DEP from using. Well, that is the position that the DEPA has taken, right? That was the position that the state agency took. EPA has not taken that position. No, EPA has not taken that position. EPA expressly states that it doesn't see 562 as prohibiting them from developing, and in fact DEP has now changed its tune on 562. If you look at the memorandum of agreement, DEP agrees that there is no obstacle to it generating these TMDLs and that it doesn't need a new methodology to do them, and that's in the record. It says in that memorandum of agreement that starts the schedule that Mr. Mason was talking about, DEP acknowledges we have no barriers to our present development of TMDLs. They don't have to get a new methodology before they do those. That was always just the reason that they withdrew from the program. It was their construction of the statute or the Senate Bill, but I submit that that Senate Bill never told them that that's what they had to do. And when you look at what they did under that, Judge Floyd inquired about this. Are you saying that the agency's interpretation of the West Virginia statute was unreasonable? I am saying that it was contrary to the plain language of the statute, and I think that any reasonable observer who reads the language of Senate Bill 562 cannot conclude that there's a prohibition on them using existing methodologies. I'm not saying prohibition. The EPA suggests that the statute broadened the criteria, the object of measurement. In other words, that it wasn't just limited to a very small biological form of life, but to a larger form of life that includes fish. That's right. Is that true? What the legislature said was don't be less restricted than you already are, but please develop an aspect of your assessment methodology to look at fish in those streams. Well, that is a broadening then, isn't it? Well, it's a broadening of the methodology, sure, but it doesn't say that they can't use the existing methodology in the meantime. You don't know whether it applies to fish, do you? I'm sorry? A methodology that's aimed at small microbiological life might be totally different from the effect that it has on fish. But I submit that 562 requires them to retain the look at the small biological life. Does it say that? It does. The 562, as it's in the record, says that this shall be no less stringent than the one that you're already using. So it was to add fish on top of it. That's what I was saying. It broadened it, didn't it? Certainly it broadened it, but it did not take away DEP's ability to do TMDLs in the meantime. But it seems to me in your answer to Judge Niemeyer's question, you're acknowledging that it required the state agency to come up with another standard, a new standard, because it has to now cover fish. It couldn't change. Let me take a step back, if I may. It couldn't broaden the water quality standard. The water quality standard is a narrative standard that says there shall be no degradation of the biological integrity of the water. And so what the methodology does is it empowers the agency to look at the stream and figure out is the biological integrity impaired. For more than a decade, DEP had used a macro-invertebrate index and has two methodologies that are approved by the United States EPA. Tell me what that is, macro-invertebrates. Are those the little amoeba-type things? No. An amoeba would be a much smaller life form. A benthic macro-invertebrate are in the life cycle of— Algae? No, they're not algae. They are animals. They are mayflies, basically. They are mayflies and other aquatic insects that are the keystone of the aquatic ecosystems that the fish depend on. So when they add fish, it seems to me if they haven't focused on fish, it's going to have to broaden their test. Well, it may broaden their test, but that doesn't deprive them of the ability to do TMDLs to protect these already impaired waters. Sure it does. If the test is not focused on fish, they accomplish nothing because the legislature has told them to do fish, too. But the legislature could not change the fact that hundreds of streams have already been designated as biologically impaired by DEP and approved by EPA. Something has to be doing— Nobody's debating that. There's 500 and some streams that have been on that list. That's correct. But the question then is to develop TMDLs for each of the streams. That's correct. And the test up to one point was these invertebrates, and now the legislature has added fish. And according to the EPA, West Virginia is working on that test now that no other state has done yet. But in the meantime, those streams remain impaired and remain water quality impaired. And the Supreme Court has told us that the solution to pollution problems doesn't have to await changes in the administrative agencies. And the TMDL section of the Clean Water Act itself emphasizes that these are to be done with speed. Congress expected them to be done two years after the 1972 Clean Water Act amendments were passed. And from time to time thereafter, it has to be viewed in the context of that instruction that the first time you've got to do it is two years after 1972. And additionally, the text of the TMDL provision requires that the EPA and the state agencies account for lack of information and move forward and act and put a margin of safety in there. The idea is to get the pollution budget in place. Later, if it has to be revisited because of a change as a result of the methodology, then that is the way to do it. It's not to wait for the new methodology when DEP has shown that it is unable or unwilling to develop it. Judge Floyd asked about the status of it. There is currently still, in 2018, no new methodology developed by DEP. DEP does not have a new methodology out for comment. As EPA observed, it's going to have to be approved by the legislature. It does not look like they would be able to get a new methodology before even the 2019 West Virginia legislature. So at this point, the TMDLs for biological impairment in West Virginia are in administrative purgatory as a result of Senate Bill 562. That is the reason that the district court correctly concluded that DEP has clearly and unambiguously said it's not going to do biological impairment TMDLs. It hasn't been able to develop a new methodology. Now the agency admits that it never needed to do a new methodology to begin with. Based on this record, this state has said to DEP, we're not going to do the biological impairment TMDLs. And the reason that they've used the assessment methodology, they haven't been able to generate that. At this point, if there isn't a constructive submission here, then if it's only that unique case of Alaska where there was a complete failure to do any, well then there isn't a constructive submission. That's the only case that's held it, applied it. Well that's the only case that's applied it and actually found an affirmative constructive submission. But if you look at the District of Columbia Kingman Park case, if you look at the Eastern District of Virginia American Canoe Association cases, those are cases where EPA moved to dismiss and said, you can't find a constructive submission on these facts. And the court said, yeah, we could. We're not going to right now because of the posture of the case, but we could. And then those cases settled. So while it is true that only one court has found that, the constructive submission doctrine has led to thousands and thousands of TMDLs in this country. And, in fact, in the state of California there are three consent decrees that dealt with subsets of TMDLs that were not a statewide failure. But taking your point, there have been TMDL, there have been deadlines set because of this litigation. And what more do you want now? Well, we're just trying to defend those deadlines at this point. Because if this court were to reverse the district court. I thought that that was done. I mean, they're already in place. If you read the memorandum of agreement, both parties reserve the right to withdraw that schedule in the event that this court reverses. That's in the memorandum of agreement. That's why this case isn't moved. And that's why we're still here, you know, vehemently defending what the district court did. I appreciate that answer because I was. Yeah, if you look closely at the memorandum of agreement, it's pretty telling that. Do you know where it is, actually? I know below. I know your colleague will know, right? Yeah, it was document 107 in the district court record. I believe it to be near the. So it will be in the first volume of the appendix, probably around page 200 or so. Okay, thanks so much. Thank you. Thank you. All right, Mr. Masonette. It was document 107. I'm impressed. So I was under the impression when you were arguing this case that you were telling us that these deadlines were in place and that therefore, and it's the therefore, there really is no need for saying that there has to be a constructive action here. And is it your position, really, that you can do these deadlines in? So, Your Honor, the West Virginia had a schedule for these TMDLs before the district court ruled. It's now got a new schedule that is memorialized in a memorandum of agreement with the EPA that is, as Mr. Taney said, a result of this litigation because what the district court ordered EPA to do was to approve or disapprove the constructive submission of no TMDLs. And what EPA did was they approved the no TMDLs contingent on West Virginia meeting this schedule. So what happens to that agreement if we say that under the facts of this case, constructive submission does not apply? Well, I don't know what would happen to the agreement that's in place now. As Mr. Taney says, it does have terms that make it clear that if this court reverses the district court, we could modify or withdraw from that agreement. And so could the state. And so could the state. And, of course, they can do that now as well, right? I mean, this was an EPA doesn't – it's not that the district court set a schedule for these TMDLs, right? It's not that EPA set a schedule for them. EPA approved the no TMDLs based on this memorandum of agreement. So the parties have that power right now. The state could withdraw from the TMDLs right now if it wanted to. It's not that they would then be in some kind of contempt. I guess I don't follow your – because then what we should be reviewing is not that schedule, but EPA's position that it's okay to not have a schedule, right? Well, so what was before the district court was whether or not so much time had passed here that it amounted to a clear and unambiguous refusal by West Virginia to do these TMDLs. And I thought a big part of your submission to us is, no, that's not true. They have now got a schedule. The deadlines are quite far out, but still there is a schedule. Right. Well, that's true. But it's a schedule that apparently is elusive because either party can walk away from it at any time. Well, and the Clean Water Act lets them do that, right? I mean, the Clean Water Act gives the states the discretion they need to set their own priorities, to take the time to go out and build this enforcement tool. I don't want to also leave you with the impression that some of these TMDLs have been pending for many years. Okay, but if you could just stick with me on this. I understand that the – but your submission to us is that this agreement really doesn't matter and these deadlines that they put out really don't matter because under, I guess, you're saying under the Clean Water Act they can walk away at any time and under the agreement they can walk away at any time. And that's true. And if you read the body of case law and constructive submission, Your Honor, there have been plenty of other courts that have dealt with these issues and have relied on representations from the states. They had schedules that they were working towards completing TMDLs, and they've accepted that as enough. But were they schedules? Do we know from the opinions in those cases that they were skills that were in the same kind of each side can walk away agreement that these schedules are? Yeah, they've been – I mean, they're two separate things. There have also been, as Mr. Tini pointed out, consent decrees, of course, that were legally binding. But there have also been cases where the states said, look, we are working on these things. We've done this many and we have a plan to complete the rest, and that was enough. And that plan to complete the rest, we know that those are all plans that they can just walk away from. Well, they're not legally binding plans. The Clean Water Act doesn't require them to have legally binding plans for these TMDLs. We haven't adopted constructive submission in this circuit as I understand it. Yes, that's right. But you want us to? As I answered Judge Niemeyer before, we've asked you not to reach that issue because there are nuances lurking inside it. So we've asked you to resolve this case on the narrower ground that even assuming constructive submissions is a valid interpretation of the Clean Water Act, it shouldn't have been applied here to these facts because West Virginia has a plan to complete these TMDLs. You don't need a binding plan. You just need to come up with something. Right. And I think if you look at the cases that we've been talking about, Kingman Park, American Canoe, cases like that, you'll see that sort of language in there. You don't need a consent decree to avoid a finding of constructive submission. I thought that some of those cases, I thought that your colleague had said that they were settled. Well, yes. So then it sounds to me like there was sort of something binding. A case like Kingman Park, it discusses constructive submission in great detail and, you know, essentially comes as close as you can to making the finding without actually making it. But it discusses this sort of issue. Making what finding? A finding of constructive submission. Because Kingman Park is a case that was resolved on a motion to dismiss. The Court rejected the motion to dismiss and said these facts are sufficient to justify a finding. And the representation from the other side was that there was a settlement, an agreement. Right. But we don't have a similar agreement here because people can walk, each side can walk away from it. That's correct. Yes. But the finding, the Kingman Park decision discusses the facts in that case that support, that led that judge to conclude that, you know, you couldn't dismiss that the facts would justify a finding of constructive submission. Which difference does that make? I mean, how does that go one way or another? The consent decree wasn't part of the analysis in that Court's decision. Right. Okay. So if we made some analysis, it still wouldn't be binding. I mean, I hope we do make some analysis. But that's not going to bind anybody, I understand. Is that right? Right. Right. Well, I mean, look, the central point is that the Act doesn't set deadlines for these cases. So it's not the business of the courts to decide. I mean, what the district court here said was, I don't think you need this new assessment tool.  I understand. And I want you to go ahead and do this the other way. I really do. I think we all understand your argument about why the district court was wrong. But what the other piece of that argument was, I thought, until today, was, and we've now remedied that. We have the state now has these deadlines. And it is going to make it. It's making efforts and it's doing a lot of work, and it's now going to have in there. Yes. Well, and that's always been true. It's just not in a legally binding agreement. But it turns out that they're illusory, that they're not real. Well, I don't think that's fair, Your Honor. I don't think it's fair to say that just because the state makes a commitment and it's not in the consent decree, it's a meaningless commitment. No, no, no, I didn't say it's because it's not in the consent decree. It's because the state can walk away from it. And that's what I thought you told me. Well, that's true of the state's priorities for its entire TMDL program, right? They're not, it's watershed. I mean, the state of West Virginia's TMDL program here is a success. It's not a failure. They've done thousands and thousands of these on this rotating watershed basis. None of that, they're not bound by any agreements or commitments to do that. They do it because that's how they've interpreted their obligations under the Clean Water Act. And in this case. Well, I would think that your obligations under a federal statute would be more compelling even than your obligations under a contract. And I thought they had obligations under the federal statute, which were in fact going to be enforced by the EPA. But apparently that's not your position. They have obligations to do these TMDLs under the Clean Water Act. They don't have obligations to do them by a certain date. But if you don't ever do them, you know, the date never comes. But, I mean, as I've said, they've got a plan. It's just not a legally binding plan. That's not what's required by the statute. But a plan that's not a legally binding plan is really no plan. Well, I honestly don't see how that's the case here, and with respect. I gather what you're saying. Not everything the state does is done according to a legally binding plan. They have broad discretion. They have a whole Clean Water Act program with lots of employees. Maybe they will encounter technical difficulties, insurmountable technical difficulties. I think what I hear you saying, and I may be wrong on this, but what I hear you saying is that the agreement is a manifestation of the activity, the fact that they are going ahead with their TMDLs. They're not fitting the model for a constructive submission, which is thumbing the nose at the Act. Yes, that's right. And what other court has made a finding of constructive submission on facts like these, where there's a plan and maybe it's not a binding plan. Can I ask you this? Would EPA be taking any efforts to encourage the state to follow this plan? Right. So, as I said, under the federal-state partnership, EPA acts as a technical clearinghouse. So EPA is working with the state to help develop the new assessment tool. They provided funding for some of the monitoring and streams to build this measure of fish biotic integrity that the state needs to develop its tools. So they've been funding the state's efforts to work on that. So, yes, the EPA is helping to build. I understand helping, but if the state would say, we decided we're not going to do this, would there be any pushback from EPA? Well, if the state makes an actual, actually says, you know, we can't set TMDLs for this, then you're in another area where maybe EPA takes that in its discretion as a no TMDL, disapproves it, and then establishes its own TMDLs. Yes, that could happen. So, Bob, you approved the submission. So the memorandum is just really superfluous. And what you're saying is what you're doing is enough for now. You must make a plan anyway. That's where you are. Right. I mean, what we're doing is enough for now, and they have a plan to complete the TMDLs. And no court's made a confining constructive submission where the state came in and said, we're getting this done. So if EPA should determine that there wasn't progress in making these, it can, under the statute, create its own? That's right. So if the state came to EPA, for example, and said, you know, we just can't get these done. You do them. We refuse. No, no, no. What if EPA made a determination? We can't get them done in the next 20 years. So my understanding is that EPA retains, believes it has the discretion to make its own finding of constructive submission and say, look, you've taken so long, you've essentially submitted no TMDLs to us. Then they could disapprove those. And then under the act, EPA would then have the authority to establish its own TMDLs. Okay. All right. Thank you. Thank you, Your Honor. We'll take a very brief recess.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Henry F. Floyd